UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WESLEY S. SPEARS : CIVIL NO. 3:02CV661 (RNC)
 :
VS. :
 :
MARCUS CAMBY : APRIL 1, 2005

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## I. FACTUAL BACKGROUND

  The plaintiff, Wesley Spears, commenced the present action by a complaint dated January 7,

2002 against Marcus Camby.   Spears, an attorney in Hartford, has been certified by the National

Basketball Players Association (hereinafter "NBPA") to act as a player agent for athletes in the

National Basketball Association (hereinafter "NBA").   The defendant, Marcus Camby, is a member

of the NBA and is currently a player for the Denver Nuggets.  Camby was a student at the University

of Massachusetts and a member of the university basketball team when he allegedly[1] entered into an

---

[1] Mr. Camby denies any such agreement.  Mr. Camby acknowledges that at some point in the early months of 1996 he learned that Spears had provided gifts to two of his friends, in the hopes that Mr. Camby's friends would encourage him to sign with Spears as an agent.  After that time Camby agrees that he received gratuities from the plaintiff, but in a far smaller amount than has been alleged.  Mr. Camby at all times informed Spears that he had not made a decision as to whom he would be selecting as an agent, and indeed he had not at that time decided that he would leave college to become a professional athlete after his junior year, instead of returning to college for his final year of eligibility.  In essence, it was Mr. Camby's understanding that he was receiving gifts from the plaintiff, and that the plaintiff's purpose in providing these gifts was to curry favor with Mr. Camby so that the plaintiff would be chosen as his professional sports agent.  At no time did Mr. Camby enter into any contractual agreement with the plaintiff.  Mr. Camby did not agree to hire Spears as his agent, and he did not agree to pay him any money.  However, the defendant understands that for the purpose of this motion, the Court must accept the allegations made by the plaintiff.

**DONAHUE, DURHAM & NOONAN, P.C.**
CONCEPT PARK  ●  741 BOSTON POST ROAD
GUILFORD, CONNECTICUT 06437
TEL:  (203) 458-9168  ●  FAX:  (203) 458-4424
JURIS NO. 415438

oral contract with Spears, which is the subject of this lawsuit.   Spears alleges that on December 22, 1995, he entered into an oral agreement whereby Spears would provide gratuities to Camby and his friends for a period of six months. In exchange, Camby allegedly agreed to pay Spears 4% of his annual salary and 20% of all revenue he received for marketing endorsements for his entire professional basketball career.  Spears estimates[2] that he expended $75,000 on gifts for Camby and his friends over the next six months.

Discovery has disclosed that Camby has signed several successive contracts as an NBA player. The total compensation which could be awarded under these contracts is approximately $100,000,000, even if Camby were to retire at the end of his current contract.  Thus, if plaintiff's alleged contract is enforced, the plaintiff will realize a profit of $3,925,000 for his $75,000 "investment" in the defendant.[3]  It is submitted that the plaintiff is not entitled to this extraordinary rate of return.   In the first place, the alleged contract is unenforceable as against public policy. Second, this alleged contract is unconscionable and therefore unenforceable.  Third, the alleged contract is unenforceable under Connecticut law because it violates the state's usury statute.  Fourth, the plaintiff's claim of unjust enrichment is barred by the doctrine of unclean hands.  Accordingly, summary judgment should enter in favor of defendant Marcus Camby.

## II.   <u>STANDARD</u>

---

[2] Spears does not have actual records to document these claimed expenses.  Spears acknowledged that most of these gifts – in the form of rental cars, airline tickets, tickets to basketball games, etc. – were given by him to friends of Marcus Camby, not to Camby himself.  <u>See</u> Deposition of Wesley Spears, Exhibit A at pp. 83, 88, 90,98.

[3] This does not include the 20% endorsement income which plaintiff also claims he is entitled to under his alleged contract.  It also does not include the 4% of future contracts which may be executed, assuming Camby does not retire at the end of his current contract. Camby has no current intention to retire at present.

2

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.P. 56(c). Summary judgment is appropriate if, after discovery, the nonmoving party "has

failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute." American Int'l Group, Inc. v. London Am Int'l. Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). A dispute concerning a material fact is genuine only "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc.,477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

## III. ARGUMENT

### A. The Plaintiff Cannot Maintain A Claim For Breach Of Contract Because The Alleged Contract Is Against Public Policy.

"The parties cannot expect conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect the court to enforce such a contract between them." State v. Council IV AFSCME, 27 Conn.App. 635, 640 (1992). "[I]t is unquestionably the general rule, upheld by the great weight of authority, that no court will lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain

the action, courts will not enforce it, nor will they enforce any alleged right directly springing from such contract...." Solomon v. Gilmore, 248 Conn. 769, 785, 731 A.2d 280 (1999).   "Whether a contract is enforceable or illegal is a question of law for the court, to be determined from all the facts and circumstances of each case. Similarly ... the question whether a contract is against public policy is [a] question of law dependent on the circumstances of the particular case." Parente v. Pirozzoli, 87 Conn. App. 235, 2005 WL 237591 (2005) (citation omitted). The contract which is the subject of the present plaintiff's claim is illegal, against public policy, unfair and deceptive, and is therefore unenforceable.

1.    **The Alleged Contract is Contrary to Public Policy and Unenforceable Because Connecticut Law Prohibited College Athletes from Entering Agreements with an Agent Before the Athlete's Eligibility for Collegiate Athletics Has Expired.**

Spears alleges in his complaint that on December 22, 1995 he and Camby entered into an oral contract wherein Spears would provide gratuities to Camby, Camby's family and friends in exchange for 4% of his annual salary and 20% of all revenue review from marketing and endorsements.  (See Plaintiff's Revised Complaint  at ¶10).  On December 22, 1995 Camby was a student athlete at the University of Massachusetts, playing college basketball. Camby's eligibility to compete in college athletics did not expire until the end of the college basketball season in May 1996, six months after Spears and Camby allegedly entered into the subject contract, when Camby decided to forego his senior year and enter the NBA draft.  The alleged contract between Camby and Spears was prohibited by Conn. Gen. Stat. §20-555(4)[4], which states: "An athlete agent shall not

---

[4]   The statute has been revised as Conn. Gen. Stat. §20-559(a)-(s), and now requires that agency contracts be authenticated and in writing containing, inter alia, terms of duration.   §20-

enter into an oral or written agent contract or professional sport services contract with an athlete before the athlete's eligibility for collegiate athletics expires."   (See Exhibit B).  Courts will not enforce a contract which is against public policy, nor will they enforce any alleged right directly springing from such a contract.  <u>Solomon v. Gilmore</u>, 248 Conn. 769, 785, 731 A.2d 280 (1999). Conn. Gen. Stat. §20-557(d) provides:  "any person who violates any provision of sections 20-553 to 20-558, inclusive…shall be guilty of a class B misdemeanor."  Conn. Gen. Stat. §20-557(d) (See Exhibit C).   The alleged contract is unenforceable because, as the above statute clearly shows, Connecticut has a public policy against agents entering into contracts with collegiate athletes.

The statute indicates that Connecticut has, as a matter of public policy, decided that the sort of agreement alleged in plaintiff's complaint is prohibited.  The plaintiff may not obtain an order enforcing an agreement that the legislature has deemed inappropriate.  <u>Solomon v. Gilmore</u>, 248 Conn. 769, 785, 731 A.2d 280 (1999) ("This court has… said that every contract made for or about any matter or thing which is prohibited and made unlawful by statute is a void contract, though the statute does not mention that it shall be so, but only inflicts a penalty on the offender; because a penalty implies a prohibition, though there are no prohibitory words in the statute") (citations omitted); <u>Barrett Builders v. Miller,</u> 215 Conn. 316, 324, 576 A.2d 455 (1990) ("A person who does not comply with the statutory requirements … will not be given the assistance of the courts in enforcing contracts within the provisions of the regulatory statute because such enforcement is against public policy"); <u>Parente v. Pirozzoli,</u> 87 Conn. App. 235, 240-41, 2005 WL 237591 (2005). (A partnership agreement which had the purpose of violating liquor control laws was contrary to

_____

559(i)(a).  The statute also states that agents may not furnish anything of value to a student athlete

public policy and unenforceable).   In <u>Parente,</u> the Court said, "Generally, agreements contrary to

public policy, that is those that negate laws enacted for the common good, are illegal and therefore

unenforceable. Contractual rights arising from agreements are subject to the fair exercise of the

power of the state to secure health, safety, comfort or the general welfare of the community.

Agreements that are legal on their face, yet which are designed to evade statutory requirements, are

routinely held unenforceable." <u>Id.</u> (citations omitted).   In <u>Dow and Condon, Inc. v. Brookfield</u>

<u>Development Corp.,</u> the court found that the plaintiff had violated real estate licensing regulations,

and therefore its commission contract was unenforceable.  266 Conn. 572, 833 A.2d 908 (2003). *See*

*also,* <u>Winer v. Ceslik,</u> 66 Conn. App. 842, 786 A.2d 516 (2001).

It is anticipated that the plaintiff will argue that encouraging a collegiate athlete to engage in

conduct that is prohibited by the NCAA regulations is not against public policy because Conn. Gen.

Stat. §20-555(4), as of December, 1995, did not specifically apply to Mr. Camby since the statute at

that time only applied to athletes playing at an institution of higher education "located in [this]

State." <u>See</u> 1995, P.A. 95-331, §1.  In 1997, the statute was amended to include student athletes at

any institution of higher learning, irrespective of its location within or without the State of

Connecticut.  The plaintiff may argue that because the statute did not identify Mr. Camby as an

"athlete" prior to this amendment, the contract at issue was not illegal in 1995 and therefore did not

violate public policy.  The fact that the legislature later clarified the statute to make it clear that the

prohibition would apply to all collegiate athletes irrespective of the state in which they are

competing does not in any way diminish the fact that as of December, 1995 Spears' conduct and

---

before the athlete enters the agency contract.  Conn. Gen. Stat. §20-559(m)(a).

alleged agreement was contrary to the public policy of this State. Thus, it has been held: "An amendment which, in effect, construes and clarifies a prior statute must be accepted as a legislative declaration of the meaning of the original act." Klutz v Howard, 228 Conn. 41, 409, 636 A. 2nd (1994); See also Shelton v Commissioner of Environmental Protection, 193 Conn. 506, 513-514, 479 A. 2nd 208 (1984). "An amendment that is intended to clarify the original intent of an earlier statute necessarily has retroactive effect." State v Magnano, 204 Conn. 259, 284, 528 A. 2nd 760 (1997); See also, Circle Lanes of Fairfield, Inc. v Fay, 195 Conn. 534, 540, 49 A. 2nd 363 (1985). Thus, the fact that the legislature clarified the statute to ensure that there was no mistake about the scope of the legislative intent does not in anyway alter the fact that as of December, 1995 entering into the type of contract alleged in this case was contrary to the public policy of the State of Connecticut.

Furthermore, under Connecticut law the concept of "public policy" is not limited to strictly defined statutory prohibitions. "Public policy is defined as the principle of law that holds, no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good. There is no specific list of what actions constitute a violation of public policy." Salter v E&J Health Care, Inc., 2003 WL 138401 (January, 2003). Similarly, it has been held: "No written statement of public policy can be expected to anticipate the myriad situations which arise in everyday life. Although not stated in precise words, policies can be viewed as clear, explicit and dominant by reference to relevant statutes, case law, and the clear dictates of common sense." State of Connecticut Department of Labor State Board of Mediation and Arbitration, 1999 WL 124328 (Feb. 19, 1999). The existence of a public policy does not hinge on the use of particular phraseology.

Payne v. Rozendall, 147 Vt. 488, 520 A.2d 586 (1986) (recognizing public policy against age discrimination despite state statute not including age and employer having too few employees to trigger federal statute); see also, Cloutiea v. Great Atlantic & Pacific Tea Co., 121 N.H. 915, 436 A.2d 1140, 1144 (1991) (holding that public policy exception is not limited to legislative directives.)

The public policy expressed by Conn. Gen. Stat. §20-553 in 1995 was to protect student athletes from the very conduct engaged in by Mr. Spears. Since the contract alleged by the plaintiff was contrary to this State's public policy, the plaintiff is barred from seeking to enforce it.

2.    **The Alleged Contract Is Against Public Policy and Unenforceable Because It Violates the Rules and Regulations of the National Basketball Players Association and the NCAA.**

The plaintiff has constructed a very clever theory in this case. Knowing that if he were to have alleged that there was an agreement that Camby would hire the plaintiff as his agent, the contract would be unenforceable because the National Basketball Players Association ("NBPA") Regulations require that an oral agreement to hire an agent is unenforceable,[5] the plaintiff does not claim he had an agreement to become Mr. Camby's agent. Rather, he claims that the agreement was that he would be Mr. Camby's agent if Mr. Camby were to so choose; and if Mr. Camby decided to choose another agent, then Mr. Camby would compensate the plaintiff as if he were an agent. (See Deposition of Wesley Spears, Exhibit A, at pp. 28.) Indeed, the reason the plaintiff claims that he is entitled to 4% of Mr. Camby's lifetime earnings is that the maximum allowable compensation under

---

[5] The NBPA Regulations also provide that any dispute between an agent and a player must be arbitrated by the NBPA. (See Exhibit E at p.8.)

8

NBPA Regulations is 4% of the player's annual earnings.[6]  See Exhibit E at p. 7. Thus, plaintiff's position is that even though he did not perform any of the functions of an agent (such as negotiating a contract), he is entitled to receive more compensation than an agent would be entitled to under NBPA Regulations pursuant to this alleged oral contract.  It is submitted that this theory is nothing more than a sham, and a bald-faced attempt to circumvent the NBPA Regulations.  This should not be countenanced by this Court.  This case should be recognized for what it is: an attempt by the plaintiff to enforce an illegal contract to become an agent for life.

Section I of the NBPA Regulations governing player agents (hereinafter "The Regulations") states in pertinent part:

> No person (other than a player representing himself) shall be permitted to conduct individual contract negotiations on behalf of a player (including a Rookie) and/or assist and/or advise with respect to such negotiations with NBA clubs after the effective date of these regulations unless he is (1) currently certified as a player agent pursuant to these Regulations, and (2) signs the standard form fee agreement with the player.  (See Exhibit E).

The Regulations state that one must be certified by the NBPA before representing any player. Accordingly, Spears was required to be certified by the NBPA before he could successfully represent Camby as required by the alleged contract.

---

[6] However, even an agent is not entitled to a percentage of a player's "lifetime" earnings; an agent is entitled to a percentage of the earnings on the contract procured by the agent.  The player is allowed to terminate the agent's services without further liability to the agent.  (See Exhibit E, NBPA Regulations, at p.7.)

On February 12, 1996, almost two months <u>after</u> Spears allegedly entered into the alleged oral agreement with Camby, Spears filed his written application to become a certified Player Agent pursuant to the NBPA Regulations.  Said application states in pertinent part:

> In submitting this application, I voluntarily agree to comply with and be bound by those Regulations (the NBPA regulations governing player agents as adopted effective March 7, 1986), which are incorporated herein by reference and any subsequent amendments that may be promulgated thereto.  (See Exhibit F).

Spears asks this Court to enforce an alleged contract which specifically violates Connecticut law (as discussed above) and the Constitution and Operating By-Laws of the NCAA.  The NCAA Division I Operating Manual in effect at time of the alleged conduct prohibits a college athlete from entering into *any* agreement with a prospective sports agent.  Specifically §13.3.1 states:

> An individual shall be ineligible for participation in an intercollegiate sport if he or she has ever agreed (orally or in writing) to be represented by an agent for the purpose of marketing  his or her athletics ability or reputation in that sport.
>
> (See Exhibits G & H)

Section 12.3.1.1 states:

> An individual shall be ineligible per 12.3.1 if he or she enters into a verbal or written agreement with an agent for representation in future professional sports negotiations that are to take place after the individual has completed his or her eligibility  in that sports.
>
> (See Exhibits G & H)

Finally, Section 12.3.1.2 states:

> An individual shall be ineligible per 12.3.1 if he or she (or his relatives or friends) accepts transportation or other benefits from any person who wishes to represent the individual in the marketing of his or her athletics ability.  The receipt of such expenses constitutes compensation based on

athletics skill and is an extra benefit not available to the student body in general.

(See Exhibits G & H)

These sections clearly condemn the agreement that Spears, through this lawsuit, asks this Court to enforce.

The Basic Purpose of the NCAA Constitution, which governs the conduct of collegiate athletics, is to "maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by doing so, retain a clear line of demarcation between intercollegiate athletics and professional sports." See NCAA Constitution §1.31 (Exhibit I); See also NCAA Constitution §2.9: ("Student-athletes shall be amateurs in an intercollegiate sport, and their participation should be motivated primarily by education and by the physical, mental and social benefits to be derived. Student participation in intercollegiate athletics is an avocation, and student athletes should be protected from exploitation by professional and commercial enterprise.") (See Exhibit I).

The strong public policy as evidenced by Connecticut statutes and the rules promulgated by the NCAA to protect student athletes from the precise conduct in which Spears engaged requires that the Court decline to enforce the alleged contract in the present case. As noted in the prior section of this brief, public policy encompasses more than the statutes enacted by the legislature. The Supreme Court has held that the NCAA is the "guardian of an important American tradition, the NCAA's motives must be accorded a respectful presumption of validity…" National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma, 468 U.S. 85, 66, 104 S.Ct. 29, 48 (1984). Similarly, it has been held: "The NCAA is, without doubt, a highly visible and powerful

institution… Although the NCAA, like other private businesses and organizations, is subject to numerous regulations, neither congress nor our legislature has seen fit to interfere with its general rule-making functions, whether in the area of drug testing or other fields.  Therefore, we regard the NCAA's stated motives and objectives, not with hostility or intense skepticism, but with a respectable presumption of validity." <u>Hill v. National Collegiate  Athletic Association</u>, 26 Cal. Rptr.2d 834 (January 28, 1994).

The contract that is the subject of this lawsuit directly contravenes the public policy promulgated by the NCAA.  "Public policy is defined as the principle of law that holds no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good. There is no specific list of what actions constitute a violation of public policy." <u>Salter v. E&J Health Care, Inc.</u>, 2003 WL 138401 (January, 2003).  It is submitted that the conduct in which the plaintiff admittedly engaged – enticing a 20-year-old college athlete to violate NCAA regulations – is the type of public policy which this Court should enforce by refusing to honor the alleged oral agreement.

### 3.    The Alleged Contract Is Against Public Policy and Unenforceable Because The Underlying Conduct is Unfair and Deceptive.

Contracts such as the one at issue in the present dispute have been legislatively defined as unfair and deceptive: "a violation of any provision of sections 20-553 to 20-558, inclusive, or any regulation adopted pursuant to section 20-556 shall be deemed an unfair or deceptive trade practice..." <u>See</u> Conn. Gen. Stat. §20-557(c).  (See Exhibit C).  The Department of Consumer Protection reprimanded a player agent for similar conduct on October 27, 1997 for providing airline tickets to two student athletes who were playing basketball at the University of Connecticut in an

attempt to entice them into entering into a player-agent contract.  (See Exhibit D).  The Department of Consumer Protection specifically determined that this conduct constituted a violation of the Connecticut Unfair Trade Practices Act.  (See Exhibit D).  The Department of Consumer Protection required the player-agent, John Lounsbury, to execute a Consent Order wherein he agreed to "cease and desist from giving, offering or promising anything of value to an athlete. . . or to any member of the athlete's immediate family before the athlete's eligibility for collegiate athletic expires."  (See Exhibit D).  The Consent Order identified the agent's conduct as a violation of CUTPA[7] and ordered that any violation of the Consent Order would be deemed a violation of CUTPA.[8]  Accordingly, the State of Connecticut has previously determined that the very conduct in which Spears engaged in the present dispute was unfair and deceptive and a violation of CUPTA.  Thus the alleged contract against public policy is unenforceable under Connecticut law.

### B.    The Alleged Oral Agreement is Unenforceable Because it is Unconscionable.

As noted above, the plaintiff claims to have made an investment of $75,000, and he now seeks to enforce an alleged illegal contract under which he is to receive $4 million, a return of 530%. The staggering amount of this contract is in excess of what the plaintiff could have obtained if he had in fact become Mr. Camby's agent and in fact provided the services agents provide to

---

[7] See Exhibit D: ("The Respondent, John Lounsbury, an individual, is hereby orderd to CEASE AND DESIST from any further violations of Chapter 735a of the Connecticut General Statutes. . ."

[8] See Exhibit D: ("Any violation of this CONSENT ORDER will be enforced in accordance with Section 42-110k of the Connecticut General Statutes.).

13

professional athletes.  It is submitted that this sum is so outrageous that it should be struck down as unconscionable.

Unconscionability is a matter of law to be decided by the court.  Emlee Equipment Leasing Corp. v. Waterbury Transmission, Inc., 31 Conn. App. 455, 626 A.2d 307 (1993) *citing cases*; Family Financial Services, Inc. v. Spencer, 41 Conn. App. 754, 762, 677 A.2d 479 (1996) ("The ultimate determination of whether a transaction is unconscionable is a question of law, not a question of fact"); Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 87, 612 A.2d 1130 (1992). "Unconscionability is determined on a case-by-case basis, taking into account all of the relevant facts and circumstances." LaSalle National Bank v. Freshfield Meadows, LLC, 69 Conn. App. 824, 837, 798 A.2d 445 (2002). "The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make on the one hand, and which no fair and honest man would accept on the other." Smith v. Mitsubishi Motors Corp. of America, 247 Conn. 342, 349, 721 A.2d 1187 (1998) (citations omitted).  "In practice, [courts] have come to divide this definition into two aspects of unconscionability, one procedural and the other substantive, the first intended to prevent unfair surprise and the other intended to prevent oppression."  Id.  The alleged contract in this case meets both definitions.

The alleged contract is procedurally unconscionable.  Mr. Camby, a 20-year-old college junior, was not represented by a lawyer when he allegedly entered into this career-long, multi-million dollar oral agreement.  Mr. Camby had no experience negotiating agreements of this sort. By contrast, at the time of the alleged agreement, Spears had been a lawyer for over twenty years. See, Exhibit A, deposition of Wesley Spears p. 74, line 12.  Spears was well aware that Mr. Camby

14

had limited funds at the time, and he exploited that fact to induce Camby into the alleged agreement. See, Exhibit A, deposition of Wesley Spears p. 56.  See, Family Financial Services, Inc. v. Spencer, 41 Conn. App. 754, 762, 677 A.2d 479 (1996) (Affirming that a contract was procedurally unconscionable based on the defendant's financial situation, lack of legal representation, and the lack of meaningful choice).  The fact that the alleged contract was against the public policy as enunciated in Connecticut's statutes, as well as contrary to NCAA regulations, provides further evidence that the alleged contract is procedurally unconscionable.

The alleged contract is also substantively unconscionable.  See  Smith v. Mitsubishi Motors Credit of America, 247 Conn. at 353.  "The basic test for [unconscionability] is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract ...." LaSalle National Bank v. Freshfield Meadows, LLC, 69 Conn. App. 824, 837, 798 A.2d 445 (2002).  Id. (citations omitted); Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 89, 612 A.2d 1130 (1992) ("The basic test is whether…the clauses involved are so one-sided as to be unconscionable.").  The plaintiff conceded that the agreement he claims in this action would give him a multi-million dollar return on his investment:

> Mr. Spears:    We had made an agreement that if I would provide for all of his financial needs, all of his legal needs during this period of time, [i.e. December, 1995 through May, 1996] if he had any that at the end of the season he would pay me four percent of his gross revenue and 25 percent of any endorsements.
>
> Question:    And he would pay you this four percent and 20 percent or 25?
> Mr. Spears:    Twenty-five.

15

| Question: | And when would that be paid? |
|---|---|
| Mr. Spears: | As soon as he signed his contract. |

| Question: | And it would be four percent of what? |
|---|---|
| Mr. Spears: | His gross salary. |

| Question: | For how long a period of time? |
|---|---|
| Mr. Spears: | For his career. |

See, Exhibit A, deposition of Wesley Spears pp. 66-67, Lines 16-25.

…

| Question: | So if he were to play in the NBA for 20 years, you would get four percent of his income each year? |
|---|---|
| Mr. Spears: | Correct. |

| Question: | And that would be for the work that you did for those six months or so? |
|---|---|
| Mr. Spears: | Correct. |

See, Exhibit A, deposition of Wesley Spears pp. 69, Lines 12-18.

| Question: | So this was an agreement that you thought might give you several million dollars? |
|---|---|
| Mr. Spears: | Over the course of his career, yes.  I certainly hoped so. |

See, Exhibit A, deposition of Wesley Spears pp. 74, Lines 6-10.

While Spears claims that his agreement was that he would "provide for all of his financial needs [and] all of his legal needs" during the six month timeframe (Deposition at p.66), the fact is that Spears was unable to identify any legal service he actually provided to Mr. Camby. Even if Spears had devoted himself full-time to working for Mr. Camby during this six month period, the amount of compensation he is now seeking is unconscionable.  If Spears worked 40 hours per week for six months, this would come to approximately 1,000 hours of service.  Even if there were any credible evidence that he actually spent that amount of time working for Mr. Camby, his present

16

claim would come to $4,000 per hour, more than 20 times what would be considered reasonable for an attorney's services. The fact that the value received by the defendant in the alleged contract is so disparate from the contract price is, in and of itself, justification to void the contract for unconscionability. *See,* Leasecomm Corp. v. Udeh, 1996 WL 488906 (Aug. 8, 1996) (O'Neill, J.) (Plaintiff's lease of equipment worth $143.52 to defendants for 48 months at $59.80 per month under a non-cancellable lease was grossly unconscionable); Family Financial Services v. Spencer, 41 Conn. App. 754, 764, 677 A.2d 479 (1996) (Terms of mortgage held unconscionable); Monetary Funding Group, Inc. v. Pluchino, 2005 WL 309941 Conn. App. (Feb. 15, 2005) (Terms of loan held unconscionable due to excessive interest rate and fees).

Even if the present contract were not procedurally and substantively unconscionable, it should not be enforced because it is an attempt to impose an impermissible penalty. In this regard, the plaintiff testified as follows:

> I certainly when I met Mr. Camby would not have expended the kinds of money and energy that I expended on his behalf unless I had a firm agreement with him that no matter who he chose as an agent he was going to compensate me for my efforts. So he was free to chose whoever he wanted. The expectation was that he was going to choose me, but he was free to choose whoever he wanted. But our agreement was that no matter what he did, once the season was over and once I had fulfilled my obligations to him, he would pay me four percent of his salary and 25 percent of his endorsements, which is pretty much equivalent to what an agent normally makes.

See, Exhibit A, Deposition of Wesley Spears pp. 28, lines 6-18. To put it another way, the plaintiff claims to have had an agreement with Mr. Camby whereby the plaintiff would become Mr. Camby's agent; and if Mr. Camby reneged on that agreement, Mr. Camby would pay Spears a penalty equal to the amount of an agent's commission for the duration of his entire professional career. Such an

agreement is unenforceable as an impermissible penalty.[9]  In CMG Realty of Connecticut, Inc. v. Colonnade One at Old Greenwich Limited Partnership, 36 Conn. App. 653, 653 A.2d 207 (1995), the parties had agreed that if an owner terminated a real estate brokerage contract, the owner would pay fifty thousand dollars to the broker.  The broker claimed that this was a "bargained for" alternative to performance.  Id.  The court found that, "the plaintiff [was] not seeking recovery for the use of its product but [was] seeking to impose an unconscionable penalty upon the defendant for its election not to proceed with the contract." Id. at 668.  Similarly, in the present case, this Court should not enforce the penalty which the plaintiff is seeking to exact.  To put the matter succinctly, the terms of the alleged agreement are so one-sided that no reasonable person would agree to them and no fair and honest person would accept them.  Accordingly, the Court should refuse to enforce the plaintiff's alleged agreement.

### C.    The Alleged Contract is Unenforceable Because it Violates Connecticut's Usury Statute.

The alleged agreement between Spears and Camby is unenforceable because it violates Connecticut usury laws.  The relevant Connecticut statutes state:

> "No person and no firm or corporation or agent thereof…shall, as guarantor or otherwise, directly or indirectly, loan money to any person and, directly or indirectly, charge, demand, accept or make any agreement to receive therefor interest at a rate greater than twelve per cent per annum." Conn. Gen. Stat. § 37-4.

---

[9] As noted above, the Court should refuse to enforce this alleged agreement as unenforceable under both Connecticut law and the NBPA Regulations.  Moreover, in the event that the Court believes that this agreement is not unenforceable on its face, then this alleged agreement should be recognized as an agreement pursuant to the NBPA Regulations and it should be arbitrated under the auspices of the NBPA pursuant to the NBPA agreement signed by the plaintiff.

> "No action shall be brought to recover <u>principal or interest</u>, or any part thereof, on any loan prohibited by Sections 37-4…" Conn. Gen. Stat. § 37-8 (emphasis supplied).

"Loans with interest rates in excess of 12 percent per annum are prohibited by General Statutes §37-4 and as a penalty no action may be brought to collect principal or interest on any such prohibited loan." <u>Equity Mortgage, Inc. v. Niro,</u> 44 Conn. App. 471, 408-09, 690 A.2d 407 (1997).[10] *See also,* <u>Golden v. Lyons,</u> 151 Conn. 21, 23, 193 A.2d 487 (1963).

While the plaintiff has not characterized this transaction as a loan, that is not dispositive. <u>Knights of Columbus Federal Credit Union v. Salisbury</u>, 3 Conn. App. 201, 208, 486A. 2d 649 (1985) ("The substance of the transaction rather than its form determines whether the loan is usurious.")  The fact is that the plaintiff claims to have expended $75,000 on behalf of Mr. Camby and his friends; and he is now seeking a return of $4,000,000 on that investment.  The fact that the plaintiff may not have intended to violate Connecticut's usury statute is of no moment.  As the Connecticut Supreme Court has stated: "if [the plaintiff] loaned money to the [defendant] and actually charged, demanded or accepted interest rates in excess of the legal rate of 12 percent, his action was per se usurious and cannot be condoned by any declaration of lack of intent to violate the law." <u>Golden v. Lyons</u>, 151 Conn. 21, 23, 193 A.2d 487 (1963).  Given the fact that the plaintiff provided no services to Mr. Camby other than the alleged $75,000 of expenditures, the present case cannot be characterized as anything other than an attempt to recoup the money he "lent" to Mr. Camby, along with usurious interest.  By bringing this lawsuit, the plaintiff seeks to obtain payment

---

[10] Connecticut law also provides criminal penalties for making usurious loans.  <u>Ferrigno v. Cromwell Development Associates,</u> 44 Conn. App. 439, 441, 689 A.2d 1150 (1997).

for the use of money at an exorbitant rate. Even if it were assumed that the plaintiff had documentation to support his claim of $75,000 in expenditures, the $4,000,000 he now seeks would represent an interest rate of 530%, well in excess of the 12% permitted by statute.

As noted above, while Spears claims to have been willing to provide legal services to Mr. Camby, he was unable in his deposition to describe any legal services he actually performed. Moreover, even if he had performed some services, the reasonable value of those services would have to be considered in determining whether the attempt to extract interest on the "loan" of $75,000 was usurious. Thus, the Connecticut Supreme Court has stated: "Even a broker who may properly charge a commission for the sale of his principal's property, in addition to legal interest upon sums advanced upon the property, cannot make a valid agreement to charge unreasonable and exorbitant commissions." Douglass v. Boulevard Co., 91 Conn. 601, 602, 100A. 1067 (1917). Applying these principles to the present case, the substance of the alleged contract makes it clear that it is nothing more than a usurious loan. Accordingly, it may not be enforced.

**D.      The Plaintiff's Claim of Unjust Enrichment is Barred by The Doctrine of Unclean Hands.**

Apparently aware that his claim for breach of contract was likely to be struck down because it was against public policy, unconscionable and represented an attempt to collect on a usurious loan, the plaintiff has also alleged in this action a claim for unjust enrichment. In the first place, the very principles enunciated above regarding those doctrines makes it clear that the plaintiff is not entitled to recover under any theory. Thus, under the usury statute, a lender may not even recover his principal when he attempts to exact a usurious rate of interest. Similarly, an excessive rate of interest can make

the terms of a transaction unenforceable because it is unconscionable.  Hamm v. Taylor, 180 Conn. 491, 495, 492A.2d 946 (1980).

Furthermore, one seeking equitable redress from the court must come with "clean hands". "The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue." Bauer v. Waste Management of Connecticut, Inc., 239 Conn. 515, 525, 686 A.2d 481 (1996); American Heritage Agency, Inc. v. Gelinas, 62 Conn. App. 711, 774 A.2d 220 (2001).   "[F]or a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands.... The clean hands doctrine is applied not for the protection of the parties but for the protection of the court.... It is applied ... for the advancement of right and justice." McCarthy v. McCarthy, 55 Conn. App. 326, 335, 752 A.2d 1093 (1999), cert. denied, 252 Conn. 923, 752 A.2d 1081 (2000); see also, Gelinas v. West Hartford, 225 Conn. 575, 587, 626 A.2d 259 (1993) ("One who seeks equity must also do equity and expect that equity will be done for all."). "It is clear that [the clean hands doctrine] is to be applied not by the jury but by the court in the exercise of its sound discretion." Cohen v. Cohen, 182 Conn. 193, 438 A.2d 55, 57 (1980), citing DeCecco v. Beach, 174 Conn. 29, 35, 381 A.2d 543 (1977).

The plaintiff cannot prevail on his claim for unjust enrichment because he does not come to this Court with clean hands.  There is no dispute that Spears' dealings with Mr. Camby occurred while Camby played college basketball, and that Spears provided Mr. Camby with the alleged "gratutities" in order to induce Camby to sign Spears as a sports agent.  As noted above, this conduct violated the public policy of Connecticut as well as NCAA regulations.

Spears stipulated to the State Bar of Connecticut Grievance Committee that he "sought to obtain a sports agency relationship with Marcus Camby." See Exhibits J and K. Based on this information, the grievance panel decided that there was probable cause that Spears had violated Rule 1.8(e) in that he inappropriately provided financial assistance to Mr. Camby.  The Statewide Grievance Committee later found by clear and convincing evidence that Spears indeed had violated Rules 1.8(e) and Rule 4.4.  (Exhibit L).  This practice is illegal in Connecticut, and it is prohibited by the rules of the NCAA.

Indeed, the plaintiff acknowledged that he was aware that player-agents were prohibited from providing things of value to college athletes:

<blockquote>

Question:    In a general way do you know whether there's any prohibition against agents providing things of value to college athletes?

Answer:    I would assume there is…

   …

   See, Exhibit A, deposition of Wesley Spears,  pp. 45-46, Line 11.

Question:    …Back when you became an agent in February of '96, were you aware that the rules prohibited player agents from giving things of value to college athletes?

Answer:    Well, yes I was…

   See, Exhibit A, deposition of Wesley Spears, pp. 46-47, Line 23.

</blockquote>

The fact that Mr. Camby or his friends may have realized a windfall by receiving gifts is of no consequence to the legal analysis of plaintiff's claims.  "To the extent that our conclusion might be viewed as allowing the defendants to receive a windfall at the expense of the plaintiffs, we note that this result is common, and, as we previously have determined, necessary in many cases in which

contracts are deemed unenforceable on the grounds of furthering overriding public policies." Solomon v. Gilmore, 248 Conn. 769 (1999).

"The trial court enjoys broad discretion in determining whether the promotion of public policy and preservation of the court's integrity dictate that the clean hands doctrine be invoked." Monetary Funding Group, Inc. v. Pluchino, 2005 WL 309941 *4 (Conn. App.) (Feb 15, 2005, Schaller, J.) (Invoking the clean hands doctrine where defendant was an unsophisticated borrower, not represented by counsel, an excessive interest rate was charged, an excessive origination fee was charged, and the plaintiff was aware of the defendant's dire financial situation.); Thompson v. Orcutt, 257 Conn. 301, 310, 777 A.2d 670 (2001) (Application of unclean hands doctrine was proper where plaintiff's claim rested on his own fraud).  Since the present plaintiff comes into court with unclean hands, this Court should not grant him any relief.

## IV.   **CONCLUSION**

Putting aside the tremendous leap of faith that would be required to make the assumption that an experienced lawyer entered into a multi-million dollar contract without committing it to writing, the claim of the present plaintiff should be dismissed because the contract is contrary to public policy, unconscionable and represents an attempt to extract a usurious rate of interest.  The claim for unjust enrichment should be denied on the same grounds, and on the additional ground that the plaintiff lacks clean hands.  Accordingly, defendant's motion for summary judgment should be granted.

THE DEFENDANT
MARCUS CAMBY


By:_____
       Patrick M. Noonan (ct00189)
       Donahue, Durham & Noonan, P.C.
       741 Boston Post Road
       Guilford, CT 06437
       (203) 458-9168


## <u>CERTIFICATION</u>

      This is to certify that a copy of the foregoing was mailed, postage prepaid, on the above-written date, to:

David K. Jaffe, Esq.
Brown, Paindiris & Scott
100 Pearl Street, 11th Floor
Hartford, CT 06103

Wesley S. Spears, Esq.
Attorney and Counselor at Law
53 Russ Street
Hartford, CT  06106

A. Paul Spinella, Esquire
Spinella & Associates
One Lewis Street
Hartford, CT 06103


       _____
       Patrick M. Noonan