1   A   Yes.

2   Q   And in this meeting toward the end of May,
3   you told Attorney Spears that you hadn't made up your
4   mind on what you planned to do.  Correct?

5   A   Correct.

6   Q   Now, while you were there, is it fair to say
7   that you told Attorney Spears that Tamia and Boris
8   needed two stereos that they had seen at the Wiz store?

9   A   Yes.

10  Q   And is it also fair to say that at that point
11  in time you knew that you were just scamming Attorney
12  Spears because you had already signed with ProServ?  Is
13  that fair to say?

14  A   Yes.

15  Q   But it was your decision at that time, was it
16  not, to take Attorney Spears for one last time?

17  A   Yes.

18  Q   And he did, in fact, tell you that he would
19  get the stereos and call you back.  Did he not?

20  A   Yes.

21  Q   And three days later, he did beep -- there
22  was another -- he did beep Tamia again and told him
23  that he had the stereos and asked him to come over to
24  the house to get them.  Correct?

25  A   Yes.

```
1        Q    And you -- Tamia and you drove over and
2   walked in?
3        A    Yes.
4        Q    And it's your memory that you arrived at the
5   same time?
6        A    We came together, yes.
7        Q    And you already saw in there Attorney Spears
8   and Todd Glasco, correct, in his home?
9        A    Yes.
10       Q    And, again, this was a meeting that took
11  place, as far as you know, around the middle of May of
12  '96?
13       A    Yes.
14            MR. NOONAN:  Well, actually it says
15            three days after the meeting around the end
16            of May.  So I think this is actually the end
17            of May.  If you look at the previous
18            paragraph, the previous meeting says around
19            the end of May.  Then it says three days
20            later.
21  BY MR. JAFFE:
22       Q    So this occurred sometime toward the middle
23  or end of May, three days after the prior meeting we
24  talked about, as far as you know?
25       A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | Why were you surprised -- were you surprised |
| 2 | to see Todd Glasco there? | |
| 3 | A | Yes. |
| 4 | Q | Why is that? |
| 5 | A | Just surprised to see him. |
| 6 | Q | Did you know that he knew Attorney Spears |
| 7 | before that day? | |
| 8 | A | No. |
| 9 | Q | And did Attorney Spears at that point tell |
| 10 | you, essentially, that he knew you were scamming him, | |
| 11 | that you didn't intend to sign him as an agent? | |
| 12 | A | Yes. |
| 13 | Q | And you didn't deny that, did you, at that |
| 14 | meeting? | |
| 15 | A | I didn't say anything. |
| 16 | Q | Did you have kind of, like, your head in your |
| 17 | hands? | |
| 18 | A | I just had my head down just listening. |
| 19 | Q | Well, was this meeting upsetting to you? |
| 20 | A | It wasn't upsetting. Just, you know, he was |
| 21 | upset. | |
| 22 | Q | Were you worried that this could jeopardize |
| 23 | your basketball standing in some way or hurt the | |
| 24 | university? | |
| 25 | A | The university, yes. |

1    A    No.

2           MR. NOONAN:  He didn't interview the

3   agents until after the season was over.

4           MR. JAFFE:  The objections are supposed

5   to be just as to form.  Now you're starting

6   to testify.

7           MR. NOONAN:  I objected as to the form.

8   BY MR. JAFFE:

9      Q    When is it your testimony that you decided to

10  go pro or that you were probably going pro?

11     A    Probably sometime in April I probably came to

12  that conclusion.

13     Q    But was it part of the process that you

14  needed to start -- well, let me ask you this.  When did

15  you have to decide by in order to be eligible for the

16  draft that year whether you were going pro?

17     A    I don't recall.

18     Q    But there was some cutoff date, obviously.

19  Right?

20     A    Yes, there was a cutoff date.

21     Q    Do you remember when the draft was?

22     A    The draft was in June.

23     Q    So, obviously, sometime, some substantial

24  period of time before June you had to decide whether

25  you were going pro.  You couldn't just tell them on the

```
 1   last day.  Right?
 2       A    No.
 3       Q    So when you sent out -- when the letters were
 4   sent out to the agents that you wanted to interview in
 5   conjunction with UMass, do you know whether or not you
 6   had decided at that point in time to go pro?
 7       A    No, I hadn't decided.
 8       Q    So it wouldn't be unusual to send out letters
 9   and tell them I haven't decided, but if I go pro,
10   you're my agent.  Is that how it would work?
11       A    You could still meet with the agents, sit
12   down in discussions with them.
13       Q    But you wouldn't decide -- at least as far as
14   you remember, you didn't decide to hire an agent before
15   you knew you were going pro, correct, because you
16   really couldn't do that?
17       A    Couldn't do it.
18       Q    So by the time you made a decision to hire an
19   agent, you had at that time already decided that -- at
20   least by that time decided you were going pro?
21       A    When I was interviewing the agents I still
22   didn't know if I was going pro or not.
23       Q    I'm saying once you made a decision, though,
24   that I want a certain agent, in this case ProServ, by
25   then you knew you were going pro?
```

```
 1      A    When I hired ProServ?
 2      Q    Okay.  Let's start with that.  When you hired
 3 ProServ, at that point in time you knew you were going
 4 pro.  Right?
 5      A    When I signed, yes.  When I hired them, of
 6 course.
 7      Q    But at the time that in your mind you decided
 8 that's who I want to hire as an agent, had you at that
 9 point decided that you were going pro?
10      A    Yes.
11      Q    So let me now just ask you about this.  Now,
12 we've already talked about the fact that you did take
13 some gifts and cash from Attorney Lounsbury at some
14 point in time.  Right?
15      A    Attorney Lounsbury?
16      Q    I'm sorry.  Not attorney.  From John
17 Lounsbury, right, at some point in time?
18      A    Yes.
19      Q    And the gifts started as early as spring of
20 1995.  Correct?
21      A    Yes.
22      Q    And he provided you, for example, with a
23 beeper if you needed to reach him, Lounsbury?
24      A    Yes.
25      Q    And you talked to him pretty much two or
```

```
 1   three times per week?
 2        A    We talked frequently.
 3        Q    Could it have been as much as two or three
 4   times per week?
 5        A    Probably that or more.
 6        Q    And I think you've publicly admitted to
 7   taking a couple thousand dollars in cash from him in
 8   the spring of nine -- a couple thousand dollars in cash
 9   from him in the spring of '96.  Right?
10        A    Yes.
11        Q    I'm sorry, spring of '95?  In other words,
12   when you first -- right?
13             MR. NOONAN:  Do you want to repeat the
14             question.
15   BY MR. JAFFE:
16        Q    I think you've publicly admitted that in the
17   spring of '95 you took a couple thousand dollars in
18   cash from him.  Is that right?
19        A    Yes.
20        Q    And it's also fair to say, is it not, that he
21   would ask you if you needed anything on a regular basis
22   and if you did, you would tell him?
23        A    Yes.
24        Q    And once or twice a month you would
25   receive -- at one point he bought you groceries in your
```

1  sophomore year?

2      A   Yes.

3      Q   And once or twice a month he would give you
4  cash from between $200 to a thousand dollars during
5  1995?

6      A   Yes.

7      Q   And you would meet him to receive this cash
8  regularly off campus sometimes at McDonald's?

9      A   Yes.

10     Q   Now, did you ever receive any payments from
11 ProServ or anybody representing ProServ of any type
12 prior to their signing you?

13     A   No.

14     Q   Did you ever receive any gifts of any kind
15 from ProServ or representatives of ProServ prior to
16 their signing you?

17     A   No.

18     Q   Did you answer because the tape skipped?

19     A   I said no.

20     Q   I'm sorry, sometimes I don't know if it's
21 happening on that end, but something skips and I can't
22 hear you.

23        Putting aside John Lounsbury and Attorney
24 Spears, did you ever receive any cash or gifts from any
25 other person who you thought might have wanted to be

1   Q   And you at that time, when you decided who to
2 put on the list, these names that you put on the list
3 were who you considered to be the serious contenders at
4 that time to become your agent. Correct?
5   A   Yes.
6   Q   In fact, just to be honest about this, once
7 Attorney Spears' name was not put on that list, in your
8 mind there was no realistic chance that he was going to
9 become your agent. Correct?
10  A   No.
11  Q   So in your mind after you had a discussion --
12 you had a discussion with Dave Glover and the people at
13 UMass and they had input into who you should put on the
14 list of agents to interview. Right?
15  A   Yes.
16  Q   And, in fact, one of the reasons you didn't
17 put Attorney Lounsbury on the list, we talked about
18 this before, was because you didn't trust him entirely
19 because he had been giving you gifts under the table.
20 Right?
21  A   Yes.
22  Q   And by this time you knew -- when you were
23 developing this list, you knew that Attorney Spears had
24 been giving you gifts as well. Correct?
25  A   Yes.

```
 1         A    I don't remember.
 2         Q    So you are not going to deny that he was at
 3   your mother's room with you after the game.  It's going
 4   to be your testimony that you can't remember either
 5   way.  Correct?
 6         A    I don't remember.
 7         Q    Who drove you home after the game?
 8         A    I don't remember.
 9         Q    Did Todd Glasco drive you home with
10   Salan Cisero?
11         A    I don't remember.  It was a long time ago.
12         Q    Was Todd Glasco at the Final Four Tournament,
13   if you know?
14         A    I don't remember.
15         Q    Salan Cisero was there.  Right?
16         A    I don't remember that either.
17         Q    Did your mother go to the game with a friend,
18   the Final Four game?
19         A    Yes.
20         Q    Who was -- what was the name of that friend?
21         A    I don't remember.
22         Q    So you paid Lounsbury back his money because
23   I think basically you felt that you -- that was the
24   thing -- that was the thing to do as a man and you felt
25   comfortable with doing that.  Isn't that essentially
```

1  why you paid him back?
2     A    You know, through my counsel at the time,
3  ProServ.
4     Q    But I think that as you look back, do you
5  still agree with the decision to pay him or do you
6  think you got poor counsel?
7     A    A little bit of both.
8     Q    And you paid whatever fines UMass suffered
9  because of your actions to UMass.  Correct?
10    A    Yes.
11    Q    In other words, they forfeited around
12 $160,000 or so that they received in tournament money
13 because of the -- and they forfeited their win in the
14 Final Four -- I mean their wins up to the Final Four
15 because of your actions, and you decided that was your
16 responsibility to pay them back for that.  Correct?
17    A    Yes.
18    Q    And that decision, I assume, you still feel
19 was correct?
20    A    Yes.
21    Q    I doubt you have any qualms about that
22 decision.  Right?
23    A    No, not at all.
24    Q    But you never paid -- you knew that Attorney
25 Spears had given substantial amounts of money to your