Docket No.: CV-99-0150580-S      :      SUPERIOR COURT

JOHN LOUNSBURY and MICHAEL      :      J.D. OF WATERBURY
J. DALY AS CHAPTER 7 TRUSTEE
FOR THE BANKRUPTCY ESTATE OF      :      AT WATERBURY
JOHN T. LOUNSBURY,

     :

v.      :

MARCUS CAMBY and           March 24, 2005
PROSERV, INC.      :

## MEMORANDUM OF LAW IN OPPOSITION TO
## MARCUS CAMBY'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Michael J. Daly, the Chapter 7 Trustee for the Bankruptcy Estate of John T.

Lounsbury ("Lounsbury"), submits the following Memorandum of Law in Opposition to Marcus

Camby's Motion for Summary Judgment.

### Preliminary Statement

Defendant Marcus Camby offers four arguments in favor of summary judgment. All of

which are legally and factually deficient. First, Camby argues that Lounsbury entered into an

accord and satisfaction when the parties entered into a settlement agreement. Camby neglects to

mention that he breached a material term of the settlement agreement and that he therefore has

no right to enforce the agreement. Next, Camby argues that plaintiff has asserted a claim for

promissory estoppel and that he cannot properly maintain this claim. Camby neglects to mention

that the Court and his counsel have referred to this claim as a breach of contract claim for the

entire six year duration of this case. He also neglects to review the allegations in the Complaint or the evidence in the record which properly establish a claim for breach of contract. Camby then argues that the contract at issue is unenforceable because it violates Connecticut law and is therefore against public policy. Camby neglects to mention that the contract at issue was made and was to be performed in Massachusetts, that Connecticut law does not apply, and, in any case, that the Connecticut law he cites did not exist at the time the parties entered into the contract. Moreover, to this day, Massachusetts does not have any such law. Finally, Camby argues that Lounsbury cannot prevail because he has unclean hands. At best, it remains a question of fact whether Lounsbury has unclean hands. Lounsbury was honest and direct with Camby while Camby's conduct, as a whole, was deceptive and unsavory. Defendant has set up a series of 'straw men' arguments which are easily knocked down and discarded. Plaintiff therefore respectfully requests that the Court deny defendant's Motion for Summary Judgment.

## Counterstatement of Facts

Camby entered the University of Massachusetts in the fall of 1993. P. 16, Camby Deposition.[1] Many schools recruited him "hard" because he was a promising basketball talent. P. 15, Camby Deposition. In fact, Camby considered entering the National Basketball Association ("NBA") Draft during his second year of college. P. 26, Camby Deposition. Camby

---

[1] Relevant pages of the Deposition of Marcus Camby are annexed as Exhibit 1 to the Declaration of Simon I. Allentuch.

met Lounsbury during his second year of college. P. 27, Camby Deposition. Camby testified that this first meeting consisted of Lounsbury driving Camby and his friend, Mike Williams, for five minutes back to their dorm. P. 28-31, Camby Deposition. Lounsbury testified, and other documentary evidence supports Lounsbury's testimony, that Lounsbury bought Camby groceries and was spotted helping Camby carry the groceries up to Camby's dorm room. ¶2, Affidavit of John Lounsbury.

This meeting was the beginning of a relatively intense relationship between Camby and Lounsbury. Over approximately the next eighteen months, Camby and Lounsbury spoke hundreds of times. ¶2, Affidavit of John Lounsbury. Many of these conversations took place during collect calls initiated by Camby. P. 41, Camby Deposition. Camby admitted that he and Lounsbury "talked frequently." P. 35, Camby Deposition. Camby even met Lounsbury's family and children on several occasions. ¶2, Affidavit of John Lounsbury. From the beginning, Camby knew Lounsbury was "somebody that was trying to represent me [him]" when he became a professional athlete. Pp. 35-36, Camby Deposition. Lounsbury was a certified agent. Camby testified that during this eighteen month period (fall of 1994 to the spring of 1996) Lounsbury gave him cash several times a month. He received between "a couple dollars and "$1,000 cash" on each occasion. P. 44, Camby Deposition. They met regularly at the McDonald's restaurant, outside the University Massachusetts campus. P. 44, Camby Deposition.

Camby also asked for and received a stereo and rental cars, among other items, from Lounsbury. P. 48, 49, Camby Deposition. In total, Camby received approximately $40,000.00 from Lounsbury in one form or another. P. 48, Lounsbury Deposition, vol. 2.[2]

Camby testified that Lounsbury "had a shot at representing [him]" but added that "everyone has a shot." P. 49, Camby Deposition. Lounsbury's recollection is starkly different. He testified that he and Camby "had a verbal contract." P.17, Lounsbury Deposition, vol. 2. Lounsbury testified that he confirmed the terms of the verbal contract on at least three occasions. P. 18, Lounsbury Deposition, vol. 2. Lounsbury testified that Camby first agreed that Lounsbury would represent him on approximately April 1, 1995. P. 21, 23 Lounsbury Deposition, vol. 2. Lounsbury had purchased a stereo for Camby that day. P. 21, Lounsbury Deposition, vol. 2. Lounsbury testified as follows:

> I explained to Marcus that I was not a wealthy individual, that to do some of the things that I had been doing for him, I was borrowing Peter to pay Paul, and if I wasn't going to represent him, I looked him dead in the eye, I said do me a favor, do us both a favor, let's end the relationship right now, you go your way, I'll go my way. He said no, no, no I want you here, I want you representing me. I said I can take this to the bank, Marcus, is the exact comment I made to him. He said you can take it to the bank. . . . So we made an understanding that day if he needed things he would come to me and in turn I was going to be representing him.

---

[2] Relevant pages of the Deposition of John Lounsbury are annexed as Exhibit 2 to the Declaration of Simon I. Allentuch.

Pp. 22-23, Lounsbury Deposition, vol. 2. Lounsbury testified that Camby could have become a professional during the next year. P. 23, Lounsbury Deposition, vol. 2. While the issue of Lounsbury's representation came up from time to time, Camby reaffirmed his commitment on two other occasions. P. 27, Lounsbury Deposition, vol. 2. In July, 1995, after Camby failed to return a car that Lounsbury had rented for him for weeks and Lounsbury told Camby "I'm done with you," "Marcus called me [Lounsbury] apologizing vehemently and I [Lounsbury] said, well, we need to talk." Pp. 17-18, Lounsbury Deposition, vol. 2.

Lounsbury and Camby had an extended discussion. Lounsbury testified that he told Camby:

> That we needed to treat each other with respect, that not returning phone calls on either part would not be acceptable, that if I was going to do things for him I needed responsibility on his part and that this is not the type of behavior where when he got to the NBA people would not tolerate it at different levels. And you know, not returning phone calls, not showing up on time, and I always preach to Marcus about the importance of responsibility going forward, not necessarily with me, but for his career in general. And that's what kind of, that was my niche with Marcus. That's what made me different than all the other people recruiting him. I was always brutally honest with him about nutrition, or sleeping habits, on working out, on whether he was drinking or smoking dope.

Pp. 30-31, Lounsbury Deposition, vol. 2. Lounsbury further testified that "we discussed specifically my representation of him and, you know, what it would entail going forward." P.

31, Lounsbury Deposition, vol. 2. He continued: "Mr. Camby and I specifically discussed that I would represent him in his initial NBA contract . . . .he promised that I would represent him for his first contract." Pp. 33-34, 37, Lounsbury Deposition, vol. 2. During that same discussion, Camby agreed that Lounsbury would pay him the industry standard, four percent of his initial contract. P. 39-40, Lounsbury Deposition, vol. 2. Camby and Lounsbury had a final detailed discussion about their arrangement during the fall of 1995 as Camby commenced his junior year of college. P. 41, Lounsbury Deposition, vol. 2. Camby admits that he had conversations with Lounsbury about Lounsbury representing Camby. P. 59, Camby Deposition. Camby also testified that had he become a professional during his sophomore year, Lounsbury was the only agent he was considering. P. 59, Lounsbury Deposition.

Camby always knew that taking money, gifts and gratuities from agents could hurt his team and teammates but Camby solicited and obtained these benefits in any case. P. 45, Camby Deposition. Camby admitted:

> Q.    But you knew at the time that you were taking the money
> that it was a violation of the NCAA bylaws.
>
> A.    Yes.
>
> Q.    And regardless, you took them anyway?
>
> A.    Yes.

Q.     So you had full understanding of the consequences of what you were doing with Mr. Lounsbury?

A.     Yes.

P. 95, Camby deposition. He told almost no one about the money, gifts and gratuities he received from Lounsbury. P. 45, Camby Deposition.  During Camby's sophomore year of college, Coach Calaipari told him that this type of behavior could hurt the team and place the University of Massachusetts basketball program on "probation or forfeit games or something." Pp. 21-23, Camby Depositions.  Camby, his friends and family accepted money and other items of value from other agents or would be agents. Pp. 75, 79, 83.  Camby Deposition.  There were many newspaper stories that these "favors" included prostitutes. When confronted at his deposition with questions about this conduct Camby testified:

Q.     And that included the fact that he had provided you with prostitutes?

A.     I mean, that's what was said.

Q.     That didn't happen?

A.     That's what was printed.

Q.     Right. I'm asking you didn't that happen?

A.     That's what was printed.

Q.     I'm asking you - -

7

A.    I'm saying that's what was printed.

Q.    I understand what you're saying?

A.    Yeah. I mean, that was in the papers or anything, it doesn't matter if it happened or not, that's what was written.

Q.    I understand what you're saying, but I'm asking you is that a benefit that Mr. Spears provided to you?

P. 117, Camby Deposition. Plaintiff's counsel was never able to get Camby to answer the question.

When he elected to become a professional athlete in the spring of 1996, Camby announced that defendant Proserv, Inc. would represent him. P. 87, Camby Deposition. Shortly after Camby announced that he was becoming a professional basketball player, Camby's legal counsel, James Bryant, offered to pay Lounsbury a portion of the funds he advanced to Camby. About a week later, Lounsbury received a settlement agreement (the "Settlement Agreement") in the form of a letter from Camby. ¶3, Lounsbury Affidavit. Camby testified that he discussed the terms of the Settlement Agreement with his counsel before it was sent. P. 102, Camby Deposition. The Settlement Agreement provides that Camby would pay Lounsbury the sum of $28,500.00. The Settlement Agreement further provides:

> I have no liability for nor knowledge of any of the debt in question and am making this payment gratuitously.

8

> You agree that both you and I shall keep this settlement, and
> indebtedness underlying the settlement and every fact, matter,
> negotiation, statement or other evidence of this alleged debt and
> this agreement absolutely private.

See Exhibit 1, Lounsbury Affidavit. The first statement is clearly false. The second statement concerning confidentiality was a material term for Lounsbury in signing the Settlement Agreement. ¶4, Lounsbury Affidavit. At that point, it was not public knowledge that Lounsbury had given Camby gifts, gratuities and other items. ¶4, Lounsbury Affidavit. Lounsbury states in his Affidavit that "[t]his was a very important provision to me because I wanted to preserve my career as a professional sports agent. We agreed that it was in both my interest and Marcus' to keep these details confidential." ¶4, Lounsbury Affidavit. Lounsbury signed the Settlement Agreement. ¶5, Lounsbury Affidavit.

Camby immediately violated the confidentiality provisions of the Settlement Agreement. About two to three weeks after Lounsbury signed the Settlement Agreement but before he received a fully executed copy, Desmond Connor of the Hartford Courant called Lounsbury. ¶5, Lounsbury Affidavit. He told Lounsbury that Camby had just been interviewed at the NBA predraft camp, and Camby said that Lounsbury had given Camby money and other things when he was a student at the University of Massachusetts. ¶5, Lounsbury Affidavit. A partial transcript of that interview appeared in the Hartford Courant on June 4, 1996. See Exhibit 2, Lounsbury Affidavit. The transcript states:

Courant: What about John Lounsbury?

Camby: He took care of me. He took care of me during my junior year.

Courant: What did he do?

Camby: He gave me stuff. Like he gave me money and stuff.

Courant: You took money?

Camby: Yeah.

Courant: How much was it, about? How much would you say it was?

Camby: Wow. A couple thousand through the course of the summer coming into my [junior] year. At the end of my sophomore year.

Camby never returned a signed Settlement Agreement. He had already breached its express terms.

Camby's public disclosure set off a "firestorm." ¶6, Lounsbury Affidavit. Lounsbury was bombarded with inquiries from the press, his clients, business associates, the University of Massachusetts and the NBA Player's Association. ¶6, Lounsbury Affidavit. As a direct result, Lounsbury lost his financial support which made it impossible for Lounsbury to successfully continue as an agent. ¶6, Lounsbury Affidavit. In addition, as a result of Camby's interview,

Lounsbury's name was regularly in the newspapers which made it very difficult for him to recruit players in the college community. ¶6, Lounsbury Affidavit.

Camby denied responsibility for publicizing his relationship with Lounsbury. He testified:

> Q.    How did your relationship with Mr. Lounsbury make it to the press, what broke that story?
>
> A.    I'm not too sure. I'm not sure if – I don't even want to guess. I'm not too sure.

P. 92, Camby Deposition.

Camby's wrongful disclosure was compounded by the fact that his attorney, James Bryant, publicly stated, in August, 1996, on Camby's behalf, that Lounsbury had borrowed money "on the street" (from loan sharks) to give Camby and that Camby made the payment under the Settlement Agreement because Lounsbury would be killed if he didn't pay back the loan sharks. ¶7, Lounsbury Affidavit. This statement was false. ¶7, Lounsbury Affidavit.

### Standard

In addressing a prior motion for summary judgment in this case, the Court clearly articulated its standard for summary judgment. See Lounsbury v. Camby, 2003 Conn. Super. Lexis 3128, *3-*5. Plaintiff respectfully submits that this standard is the law of the case and should be followed here.

## Argument

I.    The Settlement Agreement Is
      <u>Unenforceable Because Camby Breached Its Express Terms</u>

Contrary to Camby's argument that an accord and satisfaction bars plaintiff's claim, Camby cannot enforce the Settlement Agreement because he breached it shortly after Lounsbury signed the Agreement. <u>See</u> Exhibit 1, Lounsbury Affidavit. The Settlement Agreement was enforceable. It was signed by Lounsbury. ¶3, Lounsbury Affidavit. The parties exchanged consideration. Under the Settlement Agreement, Camby paid Lounsbury the sum of $28,500 in exchange for a release. The Settlement Agreement also provided for confidentiality. It states:

> You agree that both you and I shall keep this settlement, and
> indebtedness underlying the settlement and every fact, matter,
> negotiation, statement or other evidence of this alleged debt and
> this agreement absolutely private.

Lounsbury stated that "[t]his was a very important provision to me because I wanted to preserve my career as a professional sports agent. We agreed that it was in both my interest and Marcus' to keep these details confidential." ¶4, Lounsbury Affidavit. As set forth above, Camby and his counsel repeatedly violated the confidentiality provision. Specifically, shortly after the Agreement was executed in May, 1996, Camby told a reporter for the <u>Hartford Courant</u> that Lounsbury had given Camby money and other things when he was a student at the University of Massachusetts. ¶5, Lounsbury Affidavit. A partial transcript of that interview appeared in the

<u>Hartford Courant</u> on June 4, 1996. <u>See</u> Exhibit 2, Lounsbury Affidavit.  Camby's public disclosure set off a "firestorm".  ¶6, Lounsbury Affidavit.  He was bombarded with inquiries from the press, his clients, business associates, the University of Massachusetts and the NBA Player's Association.  ¶6, Lounsbury Affidavit.  As a direct result, he lost his financial support which made it impossible for Lounsbury to successfully continue as an agent.  ¶6, Lounsbury Affidavit.  In addition, as a result of Camby's interview, Lounsbury's name was regularly in the newspapers which made it very difficult for him to recruit players in the college community.  ¶6, Lounsbury Affidavit.

Camby's violation was compounded when his attorney, James Bryant, publicly and falsely stated, in August, 1996, on Camby's behalf, that Lounsbury had borrowed money "on the street" (from loan sharks) to give Camby and that Camby made the payment under the Settlement Agreement because Lounsbury would be killed if he did not pay back the loan sharks. ¶7, Lounsbury Affidavit.

Where a party has breached a settlement agreement, the breaching party <u>may</u> <u>not</u> seek to enforce the agreement.  In <u>Audubon Parking Assoc. Ltd. v. Barclay and Stubbs, Inc.</u>, 225 Conn. 804 (1993), where the parties entered into a settlement agreement for breach of a lease and the defendant breached the settlement agreement, the court found that the plaintiff could sue to enforce either the settlement agreement or the underlying lease.  <u>Id.</u> at 809.  The court opined:

"[a]n accord is a contract under which an oblige promises to accept a stated performance in satisfaction of the obligor's existing duty . . . If there is a breach of the accord, <u>the obligee has the option of seeking enforcement of the original duty</u> or seeking enforcement of any obligation under the accord." (emphasis added)(citations omitted) <u>Id.</u> The court went on to conclude: "thus, in the present case, the plaintiff, the plaintiff had the option of either pursing its claim for breach of the lease agreement or enforcing the duties under the accord." <u>Id.</u>

Here, Camby breached a material term of the Settlement Agreement. His breach greatly contributed to the destruction of Lounsbury's career and his eventual bankruptcy filing. By filing this action, Lounsbury has elected to enforce his underlying agreement with Camby. The Settlement Agreement is not enforceable by Camby. Camby's claim of accord and satisfaction should therefore be disregarded and his Motion denied.

II.    Contrary to Defendant's Arguments, Plaintiff Pled
       A Breach of Contract Claim Not Promissory Estoppel

Defendant employs a classic straw man argument by attempting to transform plaintiff's breach of contract claim into a promissory estoppel claim because he believes that a promissory estoppel claim is dismissible. Plaintiff pled a breach of contract claim. In the long history of this case, involving repeated briefing and judicial opinions, only now does defendant attempt to label this claim as a claim for promissory estoppel. As an illustrative example, defendant's counsel, Brock Dubin, Esq., described plaintiff's claim as a claim for breach of an oral contract in

14

Camby's papers in support of his Motion to Dismiss. See P. 4, Memorandum of Law In Support of Motion to Dismiss, dated April 10, 2003. The Court has reached the same conclusion time and again. For example, the Court referred to plaintiff's claim as a breach of contract claim when it denied defendant Proserv's Motion to Strike on June 15, 1999. In ruling on Camby's Motion to Dismiss, Judge Holzberg's August 11, 2003 decision refers to plaintiff's claim as a breach of contract claim. See August 11, 2003 Opinion (copy attached). In the Court's November 13, 2003 decision denying defendant Proserv, Inc.'s Motion for Summary Judgment, Judge Alvord referred to plaintiff's claim as a claim for breach of contract. See November 13, 2003 Opinion (copy attached). Judge Alvord, in ruling on Camby's Motion to Strike, referred to the agreement at issue as a "contract" in determining whether to strike this claim. A copy of Judge Alvord's January 26, 2004 Opinion is attached. After having been regarded as a contract claim by plaintiff, defendant's counsel and multiple judges of the Superior Court for six years, defendant's attempt to recast plaintiff's claim as a promissory estoppel claim is nonsensical.

Plaintiff has properly pled a breach of contract claim. In order to state a claim for breach of an oral agreement, Connecticut case law requires a "definite agreement on the essential terms of an enforceable agreement." Willow Funding Co., L.P. v. Grencom Assocs., 63 Conn. App. 832, 845, 779 A.2d 174 (2001); see also Suffield Development Assocs. Ltd. Partnership v. Society for Savings, 243 Conn. 832, 843, 708 A.2d 1361 (1998); Coady v. Martin, 65 Conn.

App. 758, 766, 784 A.2d 897 (2001), <u>cert. denied</u>, 259 Conn. 905, 789 A.2d 993 (2002). There is no bright line rule describing the essential elements of any and all enforceable contracts. Whether a term is essential turns "on the particular circumstances of each case." <u>Willow Funding</u>, 63 Conn. App. at 845. Here, as set forth in the Counterstatement of Facts, plaintiff entered into an oral agreement with Camby where he would represent Camby when he became a professional player pursuant to a standard agent contract, namely that Lounsbury would receive four (4) percent of Camby's initial contract. The parties agreed on the essential terms, namely services to be performed, price and duration. It was clear at that time that Camby was about to become a professional basketball player. He was considering whether to enter the NBA draft during his sophomore year of college, the year he made the agreement with Lounsbury. He entered the NBA draft during his junior year of college. Lounsbury agreed to and did provide Camby with money, gifts and gratuities. As set forth in greater detail in the Counterstatement of Facts, the parties had repeated detailed conversations about their agreement.

While the Complaint includes the word "reliance," it clearly alleges an oral agreement containing an offer, acceptance, consideration, and performance by Lounsbury. <u>See</u> Count 1, Complaint. The reference to reliance is merely illustrative that plaintiff agreed to perform his obligations under the agreement with the expectation or reliance that defendant would, in turn,

16

perform his obligations.  Defendant's entire lengthy argument about promissory estoppel is therefore irrelevant.

Even if one were to recast plaintiff's claims as a claim for promissory estoppel, defendant's argument lacks merit.  For example, defendant argues that the promise at issue was not definite but he does so by mischaracterizing Lounsbury's deposition transcript.  For example, regarding a quote from Lounsbury's deposition transcript, defendant argues that: "Lounsbury admitted that he did not discuss any contract terms with Camby." P. 9, Def. Memorandum of Law.  However, at approximately the same place in the transcript, Lounsbury testified: "Mr. Camby and I specifically discussed that I would represent him in his initial NBA contract . . . .he promised that I would represent him for his first contract." Pp. 33-34, 37, Lounsbury Deposition, vol. 2.  During that same discussion, Camby agreed that Lounsbury would pay him the industry standard, four percent of his initial contract.  P. 39-40, Lounsbury Deposition, vol. 2.

I his Motion, defendant also asks the Court to make a credibility determination when it argues that Lounsbury could not credibly believe that Camby would perform after he received a March 12, 1996 form letter from Camby sent to all agents.  Defendant ignores testimony about the letter in which Camby told Lounsbury that it was just a formality and that it would not affect their relationship.  P. 63, Lounsbury Deposition, vol. 2.  Lounsbury also testified that Camby

continued to contact Lounsbury after the letter was sent.  P. 64, Lounsbury Deposition, vol. 2. While defendant produces no evidence to contradict Lounsbury's testimony, a credibility determination in a motion for summary judgment would be inappropriate in any case. Credibility determinations are issues of fact and should be left to the finder of fact.  Accordingly, defendant's Motion should be denied.

III.    The Agreement Does Not Violate Public Policy

Defendants have previously made this argument at least four times, and the Court has rejected it at least four times (one motions to dismiss, two motions to strike, and one motion for summary judgment).  Now, Camby again argues that the Agreement at issue is against public policy, but fails to explain why the Court should reach a different conclusion on this fifth attempt.

In addressing the identical arguments in defendant Proserv's Motion for Summary Judgment, the Court held:

> In making its motion for summary judgment, ProServ asserts that because Lounsbury's conduct allegedly falls within Connecticut General Statutes § 20-555, he cannot prevail on his claims. In response to the motion for summary judgment, Lounsbury argues that based on the facts of the matter, Connecticut law does not apply. Lounsbury argues that Camby was a student at the University of Massachusetts during the period at issue, therefore Massachusetts law applied. Further, Lounsbury asserts n1 that there is no comparable Massachusetts statute, and even were

Connecticut law to be applicable, that application of the statute in
question would be impermissibly retroactive.

n1 In their brief, Lounsbury states "in order to succeed,
ProServ must demonstrate that plaintiff's conduct violated an
applicable statute at the time the contract was made . . . Defendant
seeks to retroactively apply a law to actions which occurred in
another state to another state's resident."

The movants have not demonstrated what the facts are with regard
to this claim. There is a genuine issue of material fact, and their
motion for summary judgment on counts five through eight is
denied

Lounsbury v. Camby, 2003 Conn. Super. LEXIS 3128, *8 -*9 (copy attached). The Court's

repeated refusal to accept defendants' public policy arguments are now the law of the case.

Defendants have not added any new facts which would merit a different result.

The law of the case is a judicial doctrine which "expresses the practice of judges

generally to refuse to reopen what has been decided and is not a limitation on their power . . .

Where a matter has previously been ruled upon interlocutorily, the court in a subsequent

proceeding in the case may treat that decision as the law of the case, if it is of the opinion that

the issue was correctly decided, in the absence of some new or overriding circumstance."

(Internal citations omitted.) Breen v. Phelps, 186 Conn. 86, 99, 439 A.2d 1066 (1982). The

Connecticut Supreme Court, however, has held that "[a] judge should hesitate to change his

own rulings in a case and should be even more reluctant to overrule those of another." (Internal

quotation marks omitted.) <u>Carothers v. Capozziello,</u> 215 Conn. 82, 107, 574 A.2d 1268 (1990).
Moreover, "new pleadings intended to raise again a question of law which has been already
presented on the record and determined adversely to the pleader are not to be favored."
(Internal quotation marks omitted.) <u>Breen,</u> 186 Conn. at 99. Here, defendant Camby is trying
to re-raise questions of law which have already been presented and decided. Defendant Camby
has not offered any reason why the Court should change its prior decisions.

Even if the Court were inclined to revisit its prior decisions, the agreement at issue does
not violate public policy. In Connecticut, it is well established that contracts that violate public
policy are unenforceable. <u>Solomon v. Gilmore,</u> 248 Conn. 769, 774 (1999); <u>Konover Dev. Corp.
v. Zeller,</u> 228 Conn. 206, 231 (1994); <u>Silver v. Jacobs,</u> 43 Conn. App. 184, 190 (1996).
However, "the principle that agreements contrary to public policy are [unenforceable] should be
applied with caution and only in cases plainly within the reasons on which the doctrine rests."
<u>Solomon v. Gilmore,</u> 248 Conn. at 790. Contracts entered into voluntarily by competent persons
should be held valid and enforceable in the courts. <u>Collins v. Sears, Robuck & Co.,</u> 164 Conn.
369, 377 (1973). Therefore, the impropriety "injurious to the interests of society which will
relieve a party from the obligation which he has assumed must be clear and certain before the
contract will be found void and unenforceable." <u>Id.</u>

Defendant argues that Conn. Gen Stat. 20-557(d) makes the agreement between Camby and Lounsbury illegal. Defendant must demonstrate not only that a statute prohibited Lounsbury's conduct, but whether the conduct was illegal at the time and presumably the place where it occurred.[3] 12 Havemeyer Place Company, LLC v. Gordon, 76 Conn. App. 377, 306-307 (2003). "Whether a contract is unlawful is usually determined as of the time of its making." Id. at 390. As a preliminary matter, defendant does not argue, as Proserv could not in its motion for summary judgment that the conduct occurred in Connecticut. Defendant ignores the fact that Camby was a student at the University of Massachusetts during the period at issue. Defendant ignores the fact that Camby lived in Massachusetts at school. Most importantly, defendant ignores the fact that Massachusetts does not have a statute similar to Con. Gen. Stat. § 20-555. Indeed, there is no statutory prohibition against such conduct in Massachusetts. Lounsbury's actions were legal in Massachusetts and remain legal today. If this case were pending in

---

[3] Defendant urges the Court to depart from Connecticut law and treat the NCAA guidelines as established law. Defendant offers no Connecticut precedent for this argument. Instead, he relies on a California case which appears to hold that NCAA rules have a "presumption of validity." See P. 19, Def. Memo of Law. No one has argued that the NCAA rules are invalid. This California case certainly does not stand for the proposition that it is appropriate to invalidate a contract based on NCAA rules. In addition, the NCAA rules quoted on page 17 and 18 of Camby's brief impose restrictions on Camby, not Lounsbury. As set forth in the Counterstatement of Facts, Camby knowingly and willingly violated these rules by taking gifts and gratuities from at least two people. Like defendant's other arguments, this one also lacks a legal basis.

Massachusetts and Massachusetts law applied, defendant would not be able to make this argument.[4] This fact alone disposes of defendant's argument.

Even if one were to assume that the agreement between Camby and Lounsbury was made in Connecticut, it would still not be against public policy. Defendant incorrectly argues that the 1997 version of Conn. Gen. Stat. § 20-557(d) applies retroactively because it "clarifies" the 1995 version of the statute.[5] P. 15, n 4, Def. Memo of Law. Setting aside the weakness of this argument, the 1995 version of Conn. Gen. Stat. § 20-557(d) did not exist when Lounsbury and Camby entered into their agreement. Lounsbury testified that Camby first agreed that Lounsbury would represent him on approximately April 1, 1995. P. 21, 23, Lounsbury Deposition, vol. 2. Conn. Gen. Stat. § 20-557(d) was not passed and signed into law in Connecticut until later that year. Put together, Camby now argues that Lounsbury should have complied with the law of

---

[4] Defendant does not offer a conflict of law argument and instead relies on the fact that Camby was sued in Connecticut as a basis why Connecticut rather than Massachusetts law applies.
[5] While the retroactivity analysis is entirely irrelevant because the agreement at issue was formed before the statute was originally passed in 1995, let alone amended in 1997, defendant's legal analysis is erroneous. Defendant misreads Toise v. Rowe, 243 Conn. 643 (1998). In Toise, the Supreme Court noted that "Conn. Gen. Stat. § 55-3 required that no provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect." Id. at 627-628. The only way a statute can have a retrospective effect is if the legislature "intends" it to be retrospective. The 1997 amendment to Conn. Gen. Stat. § 20-557(d) does not include any language that it is to be applied retroactively. The Supreme Court found that "[s]tatutes passed to resolve a controversy engendered by statutory ambiguity often are deemed to have a clarifying effect." Id. at 628. The court continued: "if the amendment was enacted soon after controversies arose to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act." Id. Here the amendment was enacted in 1997, two years after the original act. The statutory changes to Conn. Gen. Stat. § 20-557 in 1997 were lengthy and complex occupying two single space pages and completely reworking the statutory scheme. This is not a mere clarification. In addition, the Public Act states that it "shall take effect from its passage, except that sections 1 and 4 shall take effect October 1, 1997." Defendant's convoluted argument is wrong on the facts and the law.

22

another state had not even been enacted at the time the parties reached an agreement. Camby's retroactivity argument is without merit.

At worst, it remains a question of fact whether the alleged impropriety was "clear[ly] and certain[ly]" "injurious to the interests of society." Camby has certainly not demonstrated an absence of questions of material fact in this regard. Defendant's Motion should therefore be denied.

IV.    Defendant Has No Grounds To Assert That Plaintiff Lacks Clean Hands

Defendant's argument that plaintiff has unclean hands lacks both factual and legal merit. For example, defendant argues that plaintiff has unclean hands because he allegedly "attempted to induce Camby to enter into a contract that is illegal." P. 20, Def. Memo of Law. As set forth above, the contract at issue was not illegal in Massachusetts where it was made and where it was to be performed. At the time, it was not illegal in Connecticut either. If anyone has unclean hands, it is Camby. Lounsbury was clearly earnest in his interest and desire to represent Camby. Camby, by contrast, knowingly solicited money, gifts and gratuities from Lounsbury and then disavowed their agreement. If Camby did not intend to hire Lounsbury, he should not have accepted consideration under the agreement. Camby's counsel also told the public that Lounsbury had borrowed money from loan sharks when it was clearly false. Finally, Camby accepted money and other items, including prostitutes, from Wesley Spears, an attorney in

Hartford. Not only do the facts demonstrate that Camby, rather than Lounsbury, has unclean hands, but defendant has not offered any cases where a court has granted summary judgment based on this defense. Defendant's Motion should therefore be denied.

### Conclusion

For the reasons set forth above, plaintiff respectfully requests that the Court deny defendant Camby's Motion for Summary Judgment.

MICHAEL J. DALY, CHAPTER 7 TRUSTEE
FOR THE ESTATE OF JOHN LOUNSBURY

By: _____
    Simon I. Allentuch, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Tel.: (203)821-2000
Juris. No. 407996

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed, via U.S. mail, postage prepaid, on March 25, 2005 to the following counsel of record:

John R. Williams, Esq.
51 Elm Street
New Haven, CT 06510

Eric D. Daniels, Esq.
Robinson & Cole, LLP
280 Trumbull Street
Hartford, CT 06103

Brock T. Dubin, Esq.
Delany, Zemetis, Donahue, Durbin & Noonan, P.C.
741 Boston Post Road
Guilford, CT 06437

This is to further certify that a copy of the foregoing Memorandum was sent via facsimile and electronic mail (e-mail) on March 25, 2005 to the following counsel of record:

Brock T. Dubin, Esq.
Delany, Zemetis, Donahue, Durbin & Noonan, P.C.
741 Boston Post Road
Guilford, CT 06437

Simon I. Allentuch, Esq.